

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>BOTEILHO HAWAII<br>ENTERPRISES, INC.,<br><br>Debtor. | Case No.: 22-00827<br>Chapter 11 |
| BOTEILHO HAWAII<br>ENTERPRISES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>DUTCH-HAWAIIAN DAIRY<br>FARMS, LLC, KEES KEA, MAUNA<br>KEA MOO, LLC,<br>Defendants. | Adv. Pro. No.: 22-90021<br><br>Related: ECF 1 |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW
# ON PLAINTIFF'S TURNOVER CLAIM

The court held the trial in this adversary proceeding on June 5 and June 6, 2024. Nathan Shimodoi, Esq., represented plaintiff Boteilho Hawaii Enterprises, Inc. ("BHE"), and Frederick Arensmeyer, Esq., represented defendants Dutch-Hawaiian Dairy Farms, LLC ("DHDF"), Kees Kea, and Mauna Kea Moo, LLC ("MKM").

**FINDINGS OF FACT**

### 1. Prebankruptcy Events

BHE operates a dairy farm called the Cloverleaf Dairy and a beef cattle ranch in Hawi on Hawaii Island. The Boteilho family owned and controlled BHE.

DHDF and MKM operate a ranch in ʻOʻokala on Hawaii Island. Despite its name, DHDF does not operate a dairy. Kees Kea and his family members own and control DHDF and MKM.

In January 2020, BHE and DHDF entered into an agreement under which DHDF agreed to buy the Cloverleaf Dairy and related assets from BHE. Closing was subject to several conditions.

2

The parties expected that it would take some time to satisfy the closing conditions. Therefore, the purchase contract provided that BHE could pasture up to 100 head of cattle on MKM's property prior to closing. This provision benefitted both parties. BHE had difficulties sustaining its herd on its property because, due to a drought, BHE's pastures were overgrazed. MKM's pastures received more rain and could support additional cattle. Pasturing part of BHE's herd on MKM's property preserved the value of the herd, which benefitted BHE in the short run and would have benefitted MKM if the sale closed and MKM and DHDF became the owners of those animals.

The contract further provided that DHDF would not be responsible for the care and watering of BHE's animals and that BHE "will feed and care for animals until closing." Curiously, the contract did not explain how BHE would care for the animals pastured on MKM's land, because it did not give BHE access to that land.

U.S. Bankruptcy Court - Hawaii  #22-90021  Dkt # 107  Filed  07/11/24  Page 3 of 22

In April 2020, 100 head of BHE's heifers[1] were transported to MKM's property.

Soon thereafter, the parties orally modified the purchase contract in two important respects.

First, MKM and the Kea family orally agreed to allow BHE to pasture more than 100 head of BHE's animals on MKM's property.

Second, the parties orally agreed that MKM could deliver MKM's milk-producing cows and their calves to BHE's dairy so BHE could care for and milk the cows. This arrangement was advantageous to both parties. Regular milking protected the health and productivity of MKM's cows, and MKM did not have to care for the cows and calves when they were in BHE's possession. BHE could sell the milk that the cows produced.

---

[1] In this decision, "cattle" means animals of all ages and genders. A "calf" is an animal that is not yet sexually mature. A "heifer" is a female animal that is sexually mature but has not yet borne a calf. "Youngstock" includes calves and heifers, and a "cow" is a female animal that has given birth to at least one calf. This is generally consistent with the way the parties used those terms, although, as Mr. Kea testified, the terms are sometimes used loosely.

4

During this period, MKM delivered equipment called "dairy cow lockups" and "calf pens" to BHE, presumably to help BHE care for MKM's animals while they were in BHE's possession.

The parties agreed to multiple extensions of the closing date under the purchase contract. The last extension to which the parties agreed in writing expired on July 24, 2021, but the sale did not close by that date. DHDF, MKM, and the Kea family blamed BHE and the Boteilho family for the failure to close and the relationship between the parties became acrimonious.

Mr. Kea began to demand payment from BHE for the care of BHE's animals. The demands varied but he mostly claimed that there were 200 or more such animals. On January 30, 2021, Mr. Kea wrote that, "we have +/- 270 head of heifers in Ookala from you to help with the drought." ECF 10 at 11. On September 10, 2021, Mr. Kea wrote that, "We have cared for an average of 200 Head of animals." ECF 10 at 10. DHDF and MKM also billed BHE for the care of 200 animals. ECF 18 at 18-20. BHE refused to pay,

5

claiming that it had no obligation to do so. The defendants refused to

return any of BHE's animals unless BHE paid the amounts that MKM and

DHDF claimed they had spent to care for them. ECF 18 at 24, 29, 33-34.

### 2. *BHE's Bankruptcy Filing*

On November 21, 2022, BHE commenced a bankruptcy proceeding

under chapter 11 subchapter V (Case No. 22-827). BHE proposed and the

court confirmed a plan of reorganization. ECF 205 in Case No. 22-827.

DHDF, MKM, and Mr. Kea appealed the order confirming the plan and the

appeal remains pending. But in the meantime, the plan has become

effective and been substantially consummated, and BHE has received its

discharge.

### 3. *This Adversary Proceeding*

Soon after BHE commenced its bankruptcy case, it filed this adversary

proceeding. The amended complaint alleges that DHDF, MKM, and Mr.

Kea possessed cattle and their offspring, a trailer, and fencing panels

6

belonging to BHE and had refused to return them. ECF 7 at 3. The complaint seeks turnover of BHE's property and damages. ECF 7 at 4.

In their answer, the defendants admitted that MKM or Mr. Kea were in possession of the trailer and the fence panels, but they denied that they possessed any cattle or offspring belonging to BHE. ECF 8 at 3. They asserted a counterclaim alleging that BHE was in possession of about 100 cattle, about 450 dairy cow lockups, fifty calf pens, and other unspecified equipment belonging to MKM. ECF 8 at 4-5. The counterclaim also asserts that MKM owned the cattle that BHE claimed because BHE had abandoned the animals on MKM's land, and that MKM is entitled to an equitable lien on any animals belonging to BHE for the costs that MKM incurred to care for those animals. *Id*. at 5-9.

BHE immediately filed a motion for summary judgment compelling the defendants to turn over "Debtor's cattle (including all of their offspring)" and the trailer and fencing panels. ECF 9 at 2. Based on

U.S. Bankruptcy Court - Hawaii   #22-90021   Dkt # 107   Filed  07/11/24   Page 7 of 22

correspondence from Mr. Kea, BHE asserted that the defendants were holding 200 cattle and 65 heifers belonging to BHE. ECF 9 at 4.

In response, the defendants argued that there were issues of material fact precluding summary judgment because "the cattle at issue are not legally branded or marked for identification and were abandoned by [BHE] and left to run wild" on MKM's land. ECF 16 at 4. The defendants also disputed the number of animals claimed by BHE. The defendants acknowledged that "MKM has been in possession of approximately 160 of the abandoned cattle sought by BHEI in its current motion." ECF 17-1 at 14.

I rejected the defendants' legal arguments that they owned the animals, including the defendants' abandonment claims. I ordered the defendants to turn over to BHE the trailer and fencing panels and the cattle that BHE delivered to the defendants, the identification of which was not in dispute. Because MKM had repeatedly billed BHE for the care of 200 animals, I expected that MKM and DHDF would turn over 200 animals. ECF 22.

In late March 2023, pursuant to this order, the defendants turned over 165 cows and fifteen bull calves that were offspring of BHE's cows. ECF 40-1 at 3. The defendants did not turn over any female calves or heifers. ECF 40-1 at 4.

A few weeks later, BHE filed another motion for summary judgment. BHE complained that MKM and DHDF had not turned over all of BHE's animals. It argued that the court should order the defendants to turn over all offspring and commingled offspring in the defendants' possession or control. ECF 39.

BHE argued that the owner of a mother animal owns that animal's offspring as a matter of law. BHE offered evidence that fifteen calves on the defendants' property during the turnover were the offspring of BHE's cows. When the BHE cows walked into a trailer, fifteen calves in an adjacent pen became agitated and called out, and some of the cows responded in kind. Mr. Boteilho testified that a cow knows its calves and vice versa, and the animals reacted because they were parent and child. Mr.

9

Kea refused to turn over any offspring and said that he did not know which calves were the offspring of which cow. ECF 40-4 at 10. BHE argued that this confusion was the defendants' fault because they marked all offspring with the defendants' own tags. ECF 39-1 at 12. Therefore, argued BHE, the confusion of goods doctrine applied and BHE was the owner of the entire commingled herd. ECF 39-1.

In their response, the defendants "generally admit[ted]" the facts asserted by BHE and asserted additional facts set forth in Mr. Kea's declaration. ECF 45 at 2. Significantly, the defendants did not deny that the fifteen calves were offspring of BHE's cows, and they did not offer any evidence that they had kept any record of which calves were the offspring of which cow. ECF 45. Instead, they argued that BHE was responsible for commingling the herd because BHE delivered its animals to the defendants and made no attempt to care for them. ECF 44 at 6.

I granted BHE's motion. I ruled that, as a matter of law, the owner of a cow owns that cow's offspring. I again rejected the defendants'

abandonment argument. I noted that the defendants did not rebut BHE's evidence that the fifteen calves were the offspring of BHE's cows. I also held that the young animals were commingled and that only the defendants could have avoided that situation. Therefore, the doctrine of confusion of goods applies and all the commingled calves belong to BHE. ECF 57. There was no evidence of the number of additional offspring in question, and I made no ruling on that issue.

The defendants filed a motion for reconsideration. ECF 59. For the first time, they produced documents which purported to record the mother of the female calves born while BHE's cows were on the defendants' property. The defendants explained that they had not produced this information earlier because they thought that they were not required to do so until BHE carried its burden of proving that the commingling was wrongful. ECF 59-1 at 8. They contended that BHE had not produced any evidence of wrongfulness. ECF 59-1 at 8.

U.S. Bankruptcy Court - Hawaii   #22-90021   Dkt # 107   Filed  07/11/24   Page 11 of 22

Those records are confusing; the parties interpret them in different ways. According to BHE, the records show that about seventy-four female animals were born during that period. ECF 75 at 61. But later Mr. Kea testified that there were seventy-eight such animals. ECF 79-1 at 4-5.

On September 1, 2023, while the motion for reconsideration was pending, the defendants turned over to BHE sixty-nine heifers younger than twenty-four months that the defendants agreed were "undisputedly offspring of BHEI's cows." ECF 79-1 at 5, 79-3 at 2.

At a hearing on October 20, 2023, I denied the motion for reconsideration. I declined to excuse the defendants' failure to produce the ownership records earlier. I orally ordered the defendants to turn over nine animals that they claimed were born of the defendants' cows.

The defendants agreed to turn over the nine animals to BHE. But BHE did not immediately pick up those animals and demanded another sixty-five animals. The defendants refused to turn over the sixty-five animals.

12

BHE then filed a motion seeking a civil contempt citation. BHE alleged that the prior orders required the defendants to turn over the additional sixty-five animals and the defendants had not complied.

In response to this motion, the defendants provided an entirely new, detailed narrative with supporting documents that accounted for the animals. ECF 79. The defendants offered evidence that forty-five of the sixty-five animals were calves born of the defendants' cows that the defendants moved to BHE's land for milking and that BHE later returned to the defendants. ECF 79-1 at 7. They also offered evidence that the defendants had purchased the remaining twenty animals from Double D Ranch. ECF 79-1 at 6-7.

In its reply, BHE argued that the court had already decided that all offspring should be turned over and that the defendants' effort to prove that the offspring were not commingled came too late. ECF 81 at 2-3. BHE did not offer any responsive evidence. ECF 81.

After a hearing, I denied the motion. I declined to hold the defendants in contempt of the prior orders because none of them specified the exact number of animals that the defendants were required to turn over. ECF 86.

The case then proceeded to trial on the question of the number of animals that the defendants were required to turn over to BHE, and what equipment and how many animals BHE must return to the defendants.

### 4. *Findings Based on Trial Evidence.*

BHE did not prove by a preponderance of the evidence admitted at trial that any of the animals remaining in the defendants' possession belonged to BHE or were commingled with animals belonging to BHE.

The defendants offered convincing evidence that the remaining sixty-five animals in question always belonged to the defendants. The defendants delivered forty-five of those sixty-five animals to BHE for milking, and BHE later returned them to the defendants. The defendants

14

purchased twenty of those sixty-five animals from a third party. The sixty-five animals are not commingled with animals belonging to BHE.

The defendants proved by a preponderance of the evidence, and BHE does not dispute, that BHE is in possession of one cow, one calf, six heifers, and certain equipment (generally depicted in Exhibits D-4-6 and D-4-7) belonging to MKM.

**CONCLUSIONS OF LAW**

All the debtor's property interests at the commencement of the bankruptcy case constitute property of the bankruptcy estate. § 541(a)(1).[2] Additionally, "offspring, … of or from property of the estate" constitute property of the estate. § 541(a)(6).

When third parties hold estate property, a trustee or chapter 11 debtor in possession can file a turnover action to recover that property. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1983). Turnover draws

---

[2] Unless otherwise indicated, all citations to sections refer to provisions of the Bankruptcy Code, 11 U.S.C.

15

"far-flung estate property back into the hands of the debtor or trustee." *City of Chicago v. Fulton*, 592 U.S. 154, 160 (2021); *see* § 542.

To obtain turnover, the plaintiff must commence an adversary proceeding. Fed. R. Bankr. P. 7001(1); *see City of Chicago*, 592 U.S. at 165 (Sotomayor, J. concurring). In the adversary proceeding, the plaintiff bears the burden of proof by a preponderance of evidence. *Jacobson v. Jacobson (In re Jacobson)*, 676 F.3d 1193, 1201 (9th Cir. 2012).

To succeed in this adversary proceeding, BHE must show that the sixty-five offspring it claims (1) are property of the estate, (2) are possessed by the defendants, (3) can be used, leased, sold, or exempted, and (4) are valuable to the estate. *See* § 542(a). There is no dispute that the defendants possess the sixty-five animals in question, that BHE could use or sell the sixty-five animals if they are property of the estate, and that would be valuable to the estate. The parties dispute whether the animals are property of the estate.

16

*1. The doctrine of confusion of goods applies in this case.*

"Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979). Thus, the estate's property interest in the sixty-five offspring must derive from state law.

BHE relies on the "confusion of goods" doctrine, arguing that the defendants commingled their offspring with BHE's offspring, and that this gives BHE a property interest in all of the offspring in the defendants' possession.

There is no Hawaii case law adopting the doctrine of confusion. But the doctrine of confusion of goods is based in English common law. *Basin Elec. Power Co-op. v. ANR W. Coal Dev. Co.*, 105 F.3d 417, 422 (8th Cir. 1997); *see also The Idaho*, 93 U.S. 575, 585-86 (1876). Hawaii has generally adopted English common law. Haw. Rev. Stat. § 1-1. I predict that Hawaii courts would recognize the doctrine of confusion.

The lack of Hawaii case law means that there is no binding precedent explaining exactly how the doctrine operates in Hawaii. But the court may

U.S. Bankruptcy Court - Hawaii   #22-90021   Dkt # 107   Filed  07/11/24   Page 17 of 22

draw from decisions in other jurisdictions to predict how Hawaii courts would apply the doctrine. *Highland Greens Homeowners Ass'n v. Basave De Guillen* (*In re Basave De Guillen*), 604 B.R. 826, 836 (B.A.P. 9th Cir. 2019); *see also Twin B. Auto Parts v. Independent Auto Warehouse, Inc.* (*In re Twin B. Auto Parts, Inc.*), 271 B.R. 71, 87 (Bankr. E.D. Va. 2001) (looking to other states to apply the doctrine of confusion).

### 2. *The doctrine of confusion of goods imposed a duty on the defendants to keep their offspring separate from the plaintiff's offspring.*

The doctrine of confusion of goods applies when one party commingles its property with the property of another. *Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812, 818 (Tex. 1974). The commingling party has the burden of identifying the property. *Id.* If the commingling party cannot identify the property, it forfeits the commingled mass. *Id.*

The party that possesses cattle is obligated to keep its cattle separate from other cattle. If the possessor does not perform that obligation, it bears any losses from the resulting confusion. *Hagan v. Cosper*, 37 Ariz. 209, 220-21 (1930). In *Hagan*, the plaintiff obtained a judgment against a rancher's

18

herd of cattle branded Y-Y. *Id.* at 213-14. The plaintiff went into possession of the entire herd, including cattle with different brands subject to third-party mortgages. *Id.* at 212-13. Those third parties later foreclosed their mortgages. *Id.* A court-appointed receiver branded all offspring with a U Y-Y brand. *Id.* at 220. The plaintiff did not separate his Y-Y offspring from the main herd. *Id.* Thus, the plaintiff was forced to bear any subsequent loss of confused offspring because he should have kept his offspring separate from the other offspring. *Id.* at 220-21.

Because the defendants possessed their own cattle and BHE's cattle, they had a duty to keep the animals and their offspring separate. *See id.* If the defendants commingled the offspring and did not separate their offspring from the plaintiff's offspring, they must forfeit the all the offspring.

As I have found, the evidence at trial showed that the defendants did not commingle the sixty-five animals with any of BHE's animals. Therefore, the confusion of goods doctrine does not give BHE an interest in

19

the sixty-five animals.

BHE argues that the partial summary judgment rulings established that it is entitled to the sixty-five animals.[3] It is true that those orders stated or suggested in broad terms that the defendants' entire herd was commingled. Those statements were correct based on the record at the time because the defendants had not yet bestirred themselves to provide a comprehensive account of the ownership and parentage of the animals. Altering those orders now with respect to the animals that the defendants previously turned over would give the defendants an undeserved second (or third, or perhaps fourth, considering the defendants' motion for reconsideration and BHE's motion for contempt) bite at the apple. But applying those orders to the sixty-five animals, and ignoring the evidence that the defendants eventually provided, would be equivalent to an unwarranted litigation sanction.

---

[3] As the defendants correctly pointed out in their motion for reconsideration, this court's prior summary judgment rulings are interlocutory orders, subject to revision at any time by the court. *See* Fed. Rul. Bankr. P. 7054.

20

### 3. *BHE must turn over the defendants' equipment.*

Both parties contended at various stages of the litigation that the other side wrongfully possesses the other's equipment. BHE claimed that the defendants possessed eleven fencing panels belonging to BHE, but the defendants only turned over nine of them. BHE had no evidence to corroborate this claim, so I will not require any additional turnover of fencing panels from the defendants to BHE.

The defendants claim that BHE possesses 450 lockups and fifty calf pens belonging to the defendants. Mr. Boteilho testified that the defendants moved these assets to BHE's property and that that BHE is not using these assets. Thus, BHE must turn over 450 lock ups and fifty calf pens.

### CONCLUSION

Based upon the above findings of fact and conclusions of law, judgment will be entered in favor of the defendants for the sixty-five animals in DHDF's possession, the eight animals in BHE's possession, the lockups, and the and calf pens. Judgment will be entered in favor of BHE

21

for the nine animals mentioned above (unless BHE has already taken possession of them). The parties will arrange a mutually agreeable time to exchange animals (nine from the defendants, eight from BHE) and turn over the lockups and calf pens. Counsel for DHDF shall prepare and circulate a proposed final judgment.

**END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW**